Number 182087, Dantzler, Incorporated, et al. v. S2 Services Puerto Rico, LLC, et al. Dantzler, Inc. The PRPA assesses, imposes, or collects any enhanced security fees. In sum, our contractual compensation is independent and separate from the enhanced security fee. Now, the truth matters. The record is absolutely clear as to who charges the enhanced security fee. S2's contract with the PRPA is on record, and it clearly sets forth that it is the PRPA and not S2 who does it. I respectfully draw the attention of the court to our appendix at page 169. There, the court will find Schedule D1.1, which clearly sets forth this information, and the district court took judicial notice of this official government document. Counsel for plaintiff has also confirmed this fact, and he did so during oral argument before the district court. When opposing counsel acknowledged that it was the PRPA who, in fact, imposed the fee. This, the court can find in page 331 of our appendix, where we include a transcript of that hearing. Plaintiff's generalized allegations in the complaint that defendants, using the general generic term, collectively assessed or otherwise imposed the enhanced security fee, is not entitled to any presumption of truth because it is flatly contradicted by the documents incorporated by plaintiff's complaint and judicially noticed in this matter, as well as plaintiff's counsel's own admissions on the record. Non-plausible allegations and bare assertions are not enough. We submit, Your Honors, that it would be useful to look at the situation in the terms of privy. Let's say that tomorrow plaintiffs decided not to pay the ocean carriers the cost passed on to them. The ocean carriers still have an obligation as the regulated party to pay the enhanced security fee to the Puerto Rico Ports Authority. Let's say in this scenario that the ocean carriers, in turn, stop paying the PRPA because plaintiffs are refusing to pay this passed on cost. The PRPA can't sue plaintiffs. It can only sue the regulated party, which is the ocean carriers. The same logic works in reverse. Just as the PRPA cannot sue plaintiffs, plaintiffs cannot sue the PRPA. Rather, plaintiffs only recourse as a customer of the ocean carriers, if any, would be against the ocean carriers who pass on this cost to them. If we add yet another layer to this analysis, we find where S2 is. Because S2 is another step removed from this privy analysis. And under no scenario could plaintiffs sue us if the PRPA, I'm sorry, as to the prudential limitations on standing. So even assuming these four breaks in the causal chain that I described earlier, assuming these breaks do not preclude plaintiffs from establishing Article III standing, which we strongly believe that it should, well-established prudential limitations serve as a backstop, squarely precluding plaintiffs from having standing in this case. Curiously enough, the very case of Ben Orleans versus Hennepin, which is the only passed on cost cited by plaintiffs, which was inclined to find Article III standing, actually proves our point. Specifically, this case found that two prudential limitations categorically precluded plaintiffs from establishing standing based on the payment of a passed on cost, even when they managed to show possible Article III standing. These prudential limitations are the third-party standing doctrine and the zone of interest. In this case, there is no third-party standing. Ben Orleans explains that whatever rights a plaintiff has turn on the rights of the directly regulated party. In our case, the directly regulated party are the ocean carriers. However, plaintiff status as customers of the ocean carriers is not enough to assert third-party standing because this is not a special relationship conferring standing to assert the ocean carrier's rights. The various reasons why the courts have wisely imposed this prudential limitation is they're discussed in our brief. However, we believe that if there's one important takeaway from this portion of the analysis is this. As Ben Orleans explains, absent prudential limitation, end line consumers, anywhere in the chain of commerce, would always be able to assert commerce clause claims of the businesses from whom they purchase goods and services. This would open the floodgates to regulatory challenges and make it unduly burdensome for the government to pass regulation and could expose the government to multiple recoveries. In this case, passed on costs are also not within the zone of interest. Ben Orleans, the same case cited by plaintiffs, explains that the commerce clause purpose is to prevent economic protectionism and retaliation between states. This is the zone of interest, what the commerce clause is intended to protect. However, passed on costs do not fall within the zone of interest. In this case, plaintiffs have not alleged and could not plausibly allege that their payment of a passed on cost by ocean carriers has incited economic protectionism or retaliatory measures by other states. As Ben Orleans emphasizes, if the law were otherwise, every non-regulated consumer in the chain of commerce could challenge a regulation which would expand the commerce clause beyond its intended bounds. As to the issue of qualified immunity, the district court in this case erred in concluding that S2 and RapidScan as private entities per se were barred from invoking qualified immunity. In its analysis, the district court relied on an outdated Sixth Circuit case, which misread the Supreme Court opinion of Wyatt v. Cole, to hold that no private party, corporate or individual, was entitled to qualified immunity. However, the more recent Supreme Court case of Filarski v. Delia held that private parties are not categorically excluded from invoking qualified immunity. In Filarski, the Supreme Court explained that Wyatt was a narrow case that, quote, involved no government agents, no government interest and no government need for immunity. Well, even if the rule is not that all private parties are automatically barred, why is this one entitled to qualified immunity? Yes. The situation of S2 is particular in the sense that S2 serves as an adjunct in an essential government activity, which is specifically the legislatively mandated cargo scanning program. We're a contractor that performs the cargo scanning program to protect the public. And we do so under the direct supervision of the PRPA and the Treasury Department. S2 operates in PRPA's property under the direct supervision of PRPA personnel. The scanning is under, according to the record, the scanning is under the supervision of the Ports Authority? It absolutely is, Your Honor. It is on the record. The documents the court took judicial notice of clearly set forth how the program works. And there is absolutely no controversy of the fact that, as opposed to cases like Richardson, our case is very different because we operate within the Port of San Juan, which is PRPA property, and we're physically located in premises working collaboratively with representatives. Are there personnel from the Ports Authority supervising your work? Yes, and Treasury, because there's an interagency agreement that makes the scanning program a multi-agency effort. So there are representatives of S2 on site, which have the technical know-how and know how to operate the machines. There's also a PRPA, there's more than one. There's PRPA personnel present as part of the program and the process, and there's also Department of Treasury personnel there. So this is our situation. Are they there to supervise the scanning, or are they there to see if there are any results indicating illegal cargo or something like that? Typically, how the process works is that the initial scanning is performed by an S2 representative, an S2 employee, but it does it in conjunction with someone from the PRPA. If something is odd in the imaging, then they notify Treasury. And if Treasury is on site, and then Treasury makes a decision on how to proceed with regards to that particular container. So the way this works is completely collaborative. There's no situation in which S2 is operating independently on its own property, doing its own thing, which is a case that would be akin to Richardson. Our situation is very specific, and it's exactly what qualified immunity is supposed to provide for us, to provide that immunity to that private, in this case, private corporate entity that is performing a government function under the direct supervision of government representatives. I say that my time has expired. Yes. Thank you. Mr. Stevens, good morning. Good morning. We're going to divide our time. We have 15 minutes. I'm going to take six, and I'm going to devote the other nine minutes to Mr. Manuel Sosa. He will address the immunity issues. I will address the standing and causation issues that proceed. But let me start with this. The defendants don't collect the fees, right? I'm sorry, Your Honor? The defendants do not collect the fees, correct? He is correct. That is a fact. Physically, they do not collect the fees directly from the importers, from our clients. So how could there possibly be standing under those circumstances since there's no injury that's traceable to their actions? The operative word there is fairly traceable. We do have injury. In fact, our clients once had $150 million-plus in their bank accounts that are now in the accounts primarily of RapiScan. But let me start with this, Your Honor, if I might, because I think this gives context to your question. From the inception of the scanning program, the express contractual agreements between PURPA and RapiScan effectively set into motion violations of plaintiffs' federally protected personal rights guaranteed by the Commerce Clause. And it was all done under the imprimatur of state law. This is why. Well, you may have a claim against the Ports Authority, which collects the fee, but I'm still not understanding how you could have a claim against the company that has nothing to do with the collection of the fee. Fair traceability, so we can trace our personal losses to the conduct of the defendant, and your question is regarding RapiScan. It's fairly traceable to RapiScan because if you look at the documents that are presented in the appendix, and we agree, those are part of the record. That's a fair assessment. I think it's the record, page 169 to 172 is Schedule D of the operative agreement. And you walk through the contracts that were negotiated and signed between the parties. There was an electronic transfer of funds every day to the tune of millions and millions of dollars that was supposed to be based upon a scan record. That is that RapiScan would get a base fee based upon scans actually performed. When your bank account is increasing at millions of dollars a year, and you do not have scan records to support those deposits, you have to know, you have to believe that cargo scanning fees for cargo that was never scanned, which this court has held was unconstitutional, to collect fees on cargo that's never scanned, you become part of the process. They work together to do that. They negotiated it. Becoming part of the process is not the test. They're not collecting the fees. They're not receiving the fees. So how is it that they become responsible to you for the Port Authority's collection of the fees? This court in First Circuit in Gutierrez v. Cartagena held that a person subjects another to the deprivation of a constitutional right, and it's actionable under 1983, if they participate in another's affirmative acts, that causes the deprivation of the complaint. But personal participation is not the only prerequisite or predicate for a Section 1983 claim. Setting into motion a series of acts by others which the actor knows or reasonably should know. How did they set in motion the collection of the fees? Because the contracts were, if we carefully examined the provisions of Schedule D of each of the contracts, the funds were originally by contract supposed to be paid directly to RAPI Scan. They amended the contract to say, no, let's have the Port Authority collect those fees, and those fees are going to be paid to us, RAPI Scan. Whether or not scans are actually performed is going to be paid on all cargo entering the Port of San Juan, and after an effective date or a certain date after the approval of Regulation 8067, after that date, 100% of all estimated cargo will be paid a fee to us by electronic transfer every Wednesday. The Court has held that charging scanning fees on cargo that was never scanned is a violation of the Commerce Clause. What about charging fees on products that were scanned? Those would probably not be violations of the Commerce Clause. This Court has held that in Vasquez, that as to the ocean carriers who actually had access to scanners and had their cargo scanned, it would not be a violation of the Commerce Clause. That is correct. All right, so you're not questioning the Commonwealth's right to scan and pass along the fees to the carriers for scanning services. No, Your Honor, and another important distinction here, separate from Ben Arlene's and that line of cases, Your Honor, is we, the shippers, the importers, do not challenge the Regulation 8067. We're not saying it in and of itself is unconstitutional. We're saying it's unconstitutional to charge excessive fees pursuant to that statute on cargo that was never scanned. The criteria for determining what is an excessive fee is laid out in both Vasquez and in Trailer Bridge, the appeal from that case on behalf of the ocean carriers. They appealed just on the dormant Commerce Clause. In the lower court and in the Court of Appeals, there was no dormant Commerce Clause violation because the Regulation applied equally to in-state shippers as well as out-of-state shippers. My time is short, so I would like to close by saying the prudential standing, all we have to do for prudential standing, and this Court has addressed it and said that that is a very low threshold. And all we have to establish is that we are not attempting to assert the rights of other people. We're asserting our own personal rights, first person, and we have a constitutionally protected right under Commerce Clause not to be charged excessive fees. The other plaintiffs in Ben Arlen's were trying to assert the rights of third parties. So my time has expired, but if the Court has any other questions, I would like to close by saying this. Millions of dollars poured into RapiScan's bank account by electronic transfers, despite the absence of scanning records. They absolutely knew it. If you review Section 3.5 of Schedule D, it provides that 100% of all cargo coming into the port, a scanning fee will be paid to RapiScan on 100% even though it was never scanned. That is contractually. Your time is up. Thank you, Your Honor. Good morning. May it please the Court. Good morning, Mr. Sosa. My name is Juan Luis Sosa, and I will be addressing the issue of qualified immunity on behalf of the plaintiffs and police, the importers. S2 RapiScan should not be afforded qualified immunity in this case because of the following four reasons, which I will expand upon during my argument. Number one, there is no concern about unwarranted timidity in the performance of S2 RapiScan's scanning functions. S2 RapiScan do not perform discretionary functions. As stated by counsel, by S2's counsel, they only scan. Courage to take action is not a factor to scan cargo. Number two, there is no special talent that must be brought into the government to operate a scanner. Number three, the threat of litigation as a distraction is not by itself sufficient to afford S2 RapiScan qualified immunity. And number four, even if S2 RapiScan are legally allowed to invoke qualified immunity, it shouldn't be afforded to them because S2 RapiScan at the outset knew that there was a constitutional violation because they were charging scanning fees for cargo that was not actually scanned, and that interferes with interstate commerce and may represent additional violations of the law. Now, the Supreme Court in Richardson made clear... How is this different from Filarski? Yes, Your Honor. S2 RapiScan brings Filarski as if it was the case on point, nothing further from the truth. Filarski is a case in which a private individual was entrusted, a private labor attorney was entrusted with investigating whether a government employee was lying to its employer. And in order to do that, this attorney, this private attorney had to have the courage and has to act with no timidity in order to make a determination whether... It says that private parties can perform government functions, and if they're performing something which is a government function, they enjoy qualified immunity. Why isn't that the situation? Yes, in the case of Mr. Filarski, that is actually a private person who should be sheltered with qualified immunity. All the elements were met in the case of Mr. Filarski. The fact that S2 RapiScan are trying to put themselves in the shoes of Mr. Filarski is preposterous. Mr. Filarski was actually threatened with litigation by the subject of his investigation, and he had in his hands the rights of Mr. Delia, the subject of his investigation. So he could not be timid, he had to be courageous, and he actually faced the threat of litigation. Filarski was correctly held, and the point is that even though Filarski recognizes that Richardson and Wyatt are not contrary to that decision, and the fact that Richardson has been termed as a narrow decision, Filarski is an even narrower product of Richardson. Going into the first element of my argument, the element of unwarranted timidity. This is the most important government immunity-producing concern. It is less likely present in situations such as the one at hand, where there is a private corporation subject to competitive market pressures. Competitive market pressures create incentives for private corporations such as S2 RapiScan to avoid litigation, which would reduce profits. Elements such as the performance of an administrative task for profit, such as in this case, also counsel against affording qualified immunity. Let me jump to the second element, because I see I'm almost out of time. There is no particular talent that S2 RapiScan must display in order to conduct its operations. Operating a scanner is not something that requires talent to do. I'm not saying that anybody can do it, but anybody with a minimum of training can do it. There is no special talent needed to conduct the scanning. The element of the threat of a lawsuit by itself should not justify affording qualified immunity. It is usual for private entities to continue functioning while handling litigation. For better or for worse, litigation is a cause of doing business in our society. Whether S2 RapiScan is not afforded qualified immunity, and that may result in the potential involvement of immune government employees as witnesses in litigation, that will not be the distraction that is being addressed by an immunity case law. It is very common for government employees to be witnesses in Section 1983 cases. And as to the distraction of litigation, I remember counsel for S2 complaining before the district court that his clients were denied the opportunity to intervene in a different case involving scanning fees. So I would think that they relished the opportunity to finally state their position in the instant case. Both Filarski and Wyatt, the parties over which the court had to decide whether to afford qualified immunity were private individuals rather than corporations. Even though that is not a determinant issue, it is an important one. Because the Supreme Court case law dealing with qualified immunity deals precisely with individuals. Richardson is a very similar case to the one at hand. It is the case on point. It is neither Filarski.  It is Richardson. In conclusion, your honors, S2 Rapid Scan are private corporations operating for profit, subject to competitive market pressures, involved in non-discretionary functions that do not require a special talent. The threat of litigation is not by itself sufficient to warrant qualified immunity. Thus, the elements that would justify affording S2 Rapid Scan qualified immunity in this case are simply not present. Plaintiffs and police respectfully request that the opinion and order of the district court to grant qualified immunity to S2 Rapid Scan be affirmed. Refusing to grant qualified immunity be affirmed in that respect. If there are any questions, be more than glad to address them. Thank you. Thank you, your honors. May it please the court. Once again, Ike Lugo for the record on rebuttal. Very briefly, your honors, with all due respect to Brother Counsel, he contradicts himself when he talks about the issue of Article III standing. He concedes before questions of the court that S2 does not assess or impose the enhanced security fee. But later on in his argument, he attempts to portray the collection of fees as something that S2 does. With all due respect, he can't have his cake and eat it too. The facts are uncontroverted and the record cannot be more clear. S2 or Rapid Scan impose enhanced security fees. What we get paid is a contractual base fee that is separate and distinct and independent from the enhanced security fee. And earlier in my argument, I made specific reference to the appendix pages that contain those portions of the agreement. Facts matter. Is counsel for the other side suggesting that you have a contract with these set fees and that you're intentionally not scanning, knowing that you're going to get the fees? Let me explain to your honor how the system works. The enhanced security fee, pursuant to both the law and the holding of the district court and this court in a previous matter, requires the enhanced security fee to be imposed on cargo that comes in through the port on terminals that have the privilege of the benefit of the scanning process or the program. PRPA imposes its fee, its enhanced security fee, based on that. We get paid contractually for 100% of the incoming containerized cargo not scanned by Customs and Border Protection. And the reason for that is because contractually, we have to stand ready to scan 100% of the incoming containerized cargo not scanned by Customs and Border Protection. If a PRPA employees, in order to relieve the queue at a particular terminal, decides to let a container pass, in order to relieve the wait time for that particular terminal, that doesn't impact our fee. We're in no way encouraging the PRPA to impose an enhanced security fee for scanning that doesn't take place. And again, our fee is separate and independent from the enhanced security fee. Those are entirely two different things. And the argument suffers from the same type of defect that the allegations and the complaint does. They try to group together these concepts and muddy the waters when in reality, and the facts and the records show that these things are separate and distinct. I see that my time has expired, so I thank the court for its time. Thank you. Thank you, Your Honor.